**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | | |
|---|---|---|
| TRI-CITY PROPERTIES, LLC<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS<br><br>Defendant. | : | Civil Action No. 2:26-cv-01285 |

## COMPLAINT

NOW COMES Plaintiff, Tri-City Properties, LLC, by counsel, for its Complaint against the United States Army Corps of Engineers, seeking declaratory and injunctive relief pursuant to 5 U.S.C. §551, *et seq*., and states as follows:

## INTRODUCTION

1. Plaintiff Tri-City Properties, LLC (Hereinafter "Tri-City" or "Plaintiff"), seeks judicial review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §551, *et seq*., and 33 CFR §331.9, of a final agency action taken by the United States Army Corps of Engineers (the "Corps") Norfolk District.

2. Plaintiff seeks review of an Approved Jurisdictional Determination (AJD) finding that certain property ("the site"), which Tri-City owns, is subject to the Corps' jurisdiction as Waters of the United States ("WOTUS") under the Federal Water Pollution Control Act, 33 U.S.C. §1251, *et seq.,* (also known as the Clean Water Act or "CWA").

3. As a result of the Corps' unlawful assertion of jurisdiction, Tri-City is severely limited in its ability to use or develop the site, despite possessing a valid Virginia Water Protection

(VWP) state permit and necessary zoning authorizations, and is being substantially harmed by the same.

4. Tri-City seeks a declaration that the site is not Waters of the United States under the CWA.

5. Tri-City also seeks an injunction prohibiting the Corps from exercising jurisdiction over the site.

6. Tri-City further seeks an award of attorney fees and costs as per 28 U.S.C. §2412(d)(1)(A).

7. Tri-City has exhausted all available administrative appeals and remedies prior to seeking judicial review.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question jurisdiction); 28 U.S.C. §2201 (authorizing declaratory relief); 28 U.S.C. §2202 (authorizing further "necessary or proper relief"); 5 U.S.C. §702 (providing for judicial review of agency action under the APA); and 5 U.S.C. §706 (scope of review and remedies under the APA).

9. Venue in this Court is proper under 28 U.S.C. §1391(e)(1) because the property that is the subject of the action ("the site") is located in this district, in Chesapeake, Virginia.

**PARTIES**

10. Plaintiff Tri-City Properties, LLC, is a Virginia Limited Liability Company with a principal place of business in Virginia Beach, Virginia. At all times pertinent to this suit, Tri-City has owned the subject site.

11. Defendant United States Army Corps of Engineers is a branch of the Department of the Army and an agency of the United States.

12. Peter R. Kube is the Chief of the Eastern Regulatory Division of the Army Corps of Engineers, Norfolk District, and the person responsible for ensuring that the Corps complies with applicable regulations and laws when issuing Approved Jurisdictional Determinations. Mr. Kube issued the remanded Approved Jurisdictional Determination which is the subject of this suit.

**THE SITE**
**(Brief overview)**

13. The site is a 290-acre tract located in the City of Chesapeake, Virginia.

14. Tri-City seeks to develop a 97-acre section of the site, located in the northwest portion along Centerville Turnpike, as a mixed residential/commercial development.

**[see image next page]**




**[Graphic taken from Exhibit 2, p. 2, Remanded AJD Memorandum for the Record, showing entire 290-acre site]**

15. The Corps claims federal jurisdiction over the site, because the Corps claims that the site is "in proximity to" navigable waterways. [**Exhibit 2**[1]**, remanded AJD Memorandum for the Record, p. 9]**

16. The North Landing River is the closest navigable waterway which the Corps claims to be "in proximity to" the site. **[Exhibit 2, p. 9]**

---

[1] The exhibits attached hereto are also contained in the Administrative Record of this proceeding and are included here only to aid the Court in analyzing the Complaint.

17. The Corps admits that the North Landing River is 3.45 miles away from the site. **[Exhibit 2, p. 9]**

18. The Corps admits that the site is separated from the North Landing River by Stumpy Lake. **[Exhibit 2, p. 9]**

19. The Corps admits that Stumpy Lake is a man-made lake created by a dam, or "impoundment." **[Exhibit 2, p. 9]**

20. The Corps claims that the site is connected to the North Landing River by a series of three unnamed, non-navigable, "man-altered" ditches which the Corps refers to as "Tributaries 1-3." **[Exhibit 2, p. 12]**

21. No reasonable person could ever describe "Tributaries 1 - 3" as "streams, oceans, rivers, [or] lakes."

22. "Tributaries 1 – 3" are not, and have never been, navigable. They are not used in interstate or foreign commerce.

23. The "Tributaries" are separated from the North Landing River by a highway known as Elbow Road.

24. There is no "continuous surface connection" between the site and the North Landing River.

25. The North Landing River is easily distinguishable from any wetlands which may exist on the site, which is located miles away from the river.




## LEGAL BACKGROUND

26. Section 301(a) of the CWA, 33 U.S.C. §1311(a), prohibits the unpermitted discharge of dredged and fill material into "navigable waters."

27. Section 502(7) of the CWA, *id.* §1362(7), defines "navigable waters" to mean the "waters of the United States, including the territorial seas."

28. The Corps has promulgated regulations defining "Waters of the United States", or "WOTUS." 33 C.F.R. §328.

29. Under the Corps' regulations, some wetlands are considered WOTUS. 33 C.F.R. §328.3.

30. Whether specific wetland areas can be considered WOTUS is a threshold issue, because if the wetlands are not WOTUS there is no federal jurisdiction over the site under the CWA.

31. Conversely, if the wetlands are WOTUS, a property owner must obtain a permit from the Army Corps of Engineers to develop the site. 33 U.S.C. §1311(a).

32. Federal wetlands permits are time-consuming and expensive, often delaying development projects by years or preventing sites from being developed at all.

33. Development projects performed in federally regulated wetlands without a permit subject the owner and the developer to significant civil and criminal penalties. 33 U.S.C. §1319.

34. Wetlands which do not fall within federal jurisdiction are regulated by the states, but the federal government has no authority over those wetlands. *See e.g.*, Treacy v. Newdunn Assocs., LLP, 344 F.3d 407, 414 (4th Cir, 2003)(explaining that Virginia has broader authority to regulate its wetlands than does the federal government).

35. The Corps determines whether a particular parcel contains wetlands that are WOTUS, and is therefore subject to federal jurisdiction, by issuing an Approved Jurisdictional Determination (AJD). 33 C.F.R. §§320.1(a)(6), 331.2.

36. An AJD is a formal document issued by the Corps stating the presence or absence of WOTUS on a specific parcel of land. It may also include a written statement and map identifying the limits of such waters on the parcel. 33 CFR 331.2.

37. The Supreme Court of the United States has clearly established that AJDs may be appealed to federal district courts. United States Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590 (2016); *see also* 333 C.F.R. §331.2 ("Approved JDs are clearly designated appealable actions and will include a basis of JD with the document.")

**CURRENT LEGAL STANDARD**

38. For decades, the definition of WOTUS was vague and difficult to apply, especially with regards to wetlands.

39. Prior to May of 2023, federal jurisdiction over wetlands was determined by the so-called "significant nexus test." Under that test, the Army Corps and/or EPA could exercise federal jurisdiction over, "[i]ntrastate lakes and ponds, streams, or wetlands that either have a continuous surface connection to categorically included waters or have a significant nexus to interstate or traditional navigable waters." Sackett v. EPA, 598 U.S. 651, 653 (2023)

40. Under the "significant nexus test," the Corps and EPA took a broad view of their authority, finding federal jurisdiction in places that bore no resemblance and no direct connection to traditional navigable waterways.

41. The legal standard changed in May of 2023, when the U.S. Supreme Court issued its landmark decision in Sackett v. EPA, 598 U.S. 651 (2023).

42. In Sackett, the landowners purchased a lot near a small lake and began backfilling the property to support the construction of a modest home. Id. at 662. The EPA demanded that the Sacketts stop work and restore the site to its previous condition, claiming that the property contained federally regulated wetlands. Id.

43. In Sackett, the EPA claimed that the wetlands on the Sacketts' property were WOTUS under federal jurisdiction because they were:

> [A]djacent to (in the sense that they are in the same neighborhood as) what it described as an 'unnamed tributary' on the other side of a 30-foot road. That tributary feeds into a non-navigable creek, which, in turn, feeds into Priest Lake, an intrastate body of water that the EPA designated as traditionally navigable.

Sackett at 662-663.

44. In Sackett, the Supreme Court roundly rejected the EPA's claim of federal jurisdiction based on connections to navigable waters via unnamed, non-navigable tributaries and roadside ditches.

45. In Sackett, the Supreme Court recognized the burden placed on citizens caused by the Corps' highly technical and overbroad interpretation of WOTUS. Sackett at 669, quoting Hawkes Co. v. United States Army Corps of Engineers, 782 F. 3d 994 (8th Cir., 2015)("This is a unique aspect of the CWA; most laws do not require the hiring of expert consultants to determine if they even apply to you or your property.")

46. In Sackett, the Supreme Court emphasized the Corps' tendency to find federal jurisdiction in the vast majority of cases. Sackett at 670 ("Even if the Corps is willing to provide a jurisdictional determination, a property owner may find it necessary to retain an expensive expert consultant who is capable of putting together a presentation that stands a chance of persuading the Corps. And even then, a landowner's chances of success are low, as the EPA admits that the Corps finds jurisdiction approximately 75% of the time.")(Justice Thomas, concurring)

47. In Sackett, The Supreme Court found that, "the CWA's use of 'waters' encompasses only those relatively permanent, standing or continuously flowing bodies of water forming geographic[al] features that are described in ordinary parlance as streams, oceans, rivers, and lakes." Sackett at 671.

48. Moreover, in Sackett the Supreme Court clarified that federal jurisdiction exists only over those bodies of water if they are *navigable*. Sackett at 672 ("At a minimum, then, the use of "navigable" signals that the definition principally refers to bodies of navigable water like rivers, lakes, and oceans.")

49. Waterbodies are navigable when they are, "used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." Daniel Ball, 77 U.S. 557, 562 (1871); *see also* Sackett at 672.

50. The Supreme Court struck down the significant nexus test, making it clear that federal jurisdiction exists only over:

> [T]hose wetlands that are as a practical matter **indistinguishable from waters of the United States**. This requires the party asserting jurisdiction over adjacent wetlands to establish first, that the adjacent [body of water constitutes] . . . water[s] of the United States, (i.e., a **relatively permanent body of water** connected to traditional interstate navigable waters); and second, that the wetland has a **continuous surface connection** with that water, **making it difficult to determine where the 'water' ends and the 'wetland' begins.**

Sackett at 678-679 (internal citations omitted)(emphasis added).

51. Thus, in the present case the Corps must prove that any wetlands which may exist on the site are physically connected to the North Landing River via a "**relatively permanent waterway"** – like a navigable stream, ocean river or lake – which establishes a "**continuous surface connection**" making it difficult to determine where the wetlands end and the North Landing River begins.

52. In Lewis v. United States, 88 F.4th 1073 (5th Cir., 2023) the Fifth Circuit Court of Appeals, following the logic and tests announced in Sackett, found no federal jurisdiction when there was no continuous surface connection to WOTUS and it was "not difficult to determine where the 'water' ends and any 'wetlands' on Lewis's property begin . . . ." Id. at 1078.

53. In United States v. Chameleon, LLC, No. 3:23-cv-763-HEH (E.D. Va. Aug. 15, 2024), this very Court held that the existence of a "continuous surface connection" and "indistinguishability" are two separate elements. Because the United States failed to plead them, the court dismissed the complaint.[2]

---

[2] The Court granted the government leave to file an Amended Complaint, which the government filed on November 15, 2024. Chameleon LLC then filed another Motion to Dismiss for lack of jurisdiction. The case has been stayed while the EPA and Army Corps are in the process of updating their regulations to conform with the U.S. Supreme Court's decision in Sackett.

54. Roads, including culverted roads, break the continuous surface connection required to establish federal jurisdiction. Those were the facts of Sackett. *See also* Lewis v. United States, 88 F.4th 1073, 1076 (5th Cir. 2023).

55. In June of 2024, the U.S. Supreme Court issued another landmark decision which is directly relevant to the present case.

56. In Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024), the Supreme Court ended the so-called "*Chevron* deference" standard. Under *Chevron* deference, Courts would defer to a regulatory agencies' interpretation of regulations, even when the Court's legal interpretation was different. Id.

57. Loper Bright Enters. v. Raimondo ended the Court's deference to regulatory agencies. As the Supreme Court explained, "*Chevron* is overruled. Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the [Administrative Procedure Act] requires." Loper Bright Enters. v. Raimondo at 413.

58. Taken together and applied to the case at bar, Sackett and Loper Bright Enters. show that this Court has the authority to decide whether the subject site, which is located miles away from the nearest navigable waterway and separated by a legally installed dam and highway, and purportedly connected to navigable water by a series of unnamed ditches and underground culverts, has a "continuous surface connection" to WOTUS such that someone can hardly tell where the North Landing River ends and any on-site 'wetlands' begin.

59. The remanded AJD which is the subject of this suit contradicts Sackett, because the remanded AJD finds federal jurisdiction when the claimed connections between wetlands and WOTUS are not relatively permanent waterways; there is no continuous surface connection

between the wetlands and WOTUS; and the wetlands are not adjacent to, and are clearly distinguishable from, the North Landing River.

60. It is the Army Corps' burden to show, via the Administrative Record, that the site is WOTUS under the standard set forth in Sackett. Precon Dev. Corp. v. United States Army Corps of Eng'rs, 633 F.3d 278 (4th Cir., 2011)

61. The Army Corps must show, via the Administrative Record, that any wetlands which may be located on the site are "waters of the United States in their own right so that they are indistinguishable from [The Noth Landing River]." Sackett at 684.

62. If the Administrative Record does not support the Corps' assertion of jurisdiction, and/or if the Corps' assertion of jurisdiction is arbitrary, capricious, an abuse of discretion, contrary to law, beyond statutory authority, or adopted without legally required procedure, the Corps' assertion of jurisdiction must be reversed by this Court. 5 USCS § 706; *see also* Sackett at 684 ("This holding compels reversal here. The wetlands on the Sacketts' property are distinguishable from any possibly covered waters.")

## PROCEDURAL HISTORY

63. Tri-City has been attempting to obtain an accurate Approved Jurisdictional Determination (AJD) on this site since 1988.

64. On January 17, 2007, the Corps issued an Approved Jurisdictional Determination for the site.

65. After several years of delay, the Corps denied Tri-City's wetland permit application.

66. The 2007 AJD expired on January 17, 2012.

67. On August 27, 2015, the Corp issued another Approved Jurisdictional Determination for the site. **[AR 358 – 550].**

68. The 2015 AJD expired on August 27, 2020. **[AR 359].**

69. In February of 2024, Tri-City's wetlands consultant at Bay Environmental, Inc., submitted a Joint Permit Application to the Virginia Marine Resources Commission, seeking a state permit to develop the property.

70. On February 14, 2024, the Army Corps Norfolk Division contacted Bay Environmental, Inc., asking whether the Tri-City was requesting the Corps to issue an AJD.

71. Bay Environmental, Inc., informed the Corps that Tri-City was not requesting an AJD, because under the Sackett decision the site does not fall under federal jurisdiction.

72. In 2023 – at Tri-City's request – the Virginia Department of Environmental Quality (VDEQ) visited the site and performed a "wetlands delineation" to determine the extent and location of wetlands on the property.

73. VDEQ is the Virginia state agency with authority over wetlands in the Commonwealth.

74. A wetlands delineation is a scientific study whereby environmental scientists confirm the presence or absence of wetlands on a property.

75. On May 22, 2024, the VDEQ issued a Public Notice with a 30-day comment period related to the permit request. Only one public comment was received, which was an information request from a potential agent. The Corps chose not to participate or raise any concerns during the public comment period.

76. On June 25, 2024, the VDEQ issued Tri-City VWP Permit #24-0284, authorizing Tri-City to impact 76.28 acres of wetlands. In addition to significant construction constraints and

environmental protections, the permit requires 2:1 mitigation for wetland impacts, including the dedication of approximately 600 acres of preservation land on and around the subject site.

77. On August 21, 2024, the City of Chesapeake approved Tri-City's proffer modification for the development.

78. On September 10, 2024, the Corps issued Tri-City an unsolicited AJD[3] (hereinafter, "the unsolicited AJD") **[Exhibit 3, unsolicited AJD].**

**THE UNSOLICITED AJD**

79. The Corps admits that AJDs are "typically made in response to a request." **[Exhibit 3, p. 1]**

80. It is highly unusual for the Corps to issue an unsolicited AJD. Tri-City's research has not identified even one other example of an AJD having been issued without a request.

81. The Corps' unsolicited AJD disregarded the wetlands delineation performed by the VDEQ, instead opting to rely on the expired 2015 AJD which shows more wetlands than the VDEQ's 2023 wetlands delineation. **[Exhibit 2, p. 4]**

82. The Corps admits that "The uplands depicted on the [VDEQ's] figure did not match the uplands confirmed in the 2015 AJD, so we used the 2015 AJD for this determination." **[Exhibit 2, p. 4]**

83. While disregarding the VDEQ's 2023 wetlands delineation, the Corps elected to rely on field work performed – in other locations – at some unspecified point in the past. **[Exhibit 3, p. 8, "Over the years Corps staff have done a lot of fieldwork on properties located both north and south of Elbow Road . . . ."]**

[3] In the unsolicited AJD, the Corps stated, "Although the project proponents clarified that no AJD is requested, we have prepared this AJD so that we can officially notify them of the presence of jurisdictional waters of the U.S., based on current guidance." **[Exhibit 2, p. 4]**

84. The unsolicited AJD claimed that the entire site is subject to federal jurisdiction because it has a "continuous surface connection" to the North Landing River via three ditches which the Corps calls "tributaries." **[Exhibit 3, p. 11]**

85. The Corps claims that the so-called "tributaries" connect to a canal located near Stumpy Lake. **[Exhibit 3, p. 12]**

86. The Corps claims that another "tributary" leaves Stumpy Lake in the direction of Gum Swamp. **[Exhibit 3, p. 9]**

87. A highway known as Elbow Road lies between Stumpy Lake and Gum Swamp.

88. The unsolicited AJD claimed federal jurisdiction over the site, even though the "tributary" that purportedly connects the site to the North Landing River is interrupted on the surface by Elbow Road. **[Exhibit 3, pp. 7 - 8]**

89. The unsolicited AJD claimed a "continuous surface connection" through the Elbow Road highway because the Corps interpreted the area to be "one large contiguous wetland" which "preserves hydrologic continuity through Elbow Road." **[Exhibit 3, p. 7 -8**]

90. The unsolicited AJD admitted that the "one large contiguous wetland" concept is just one possible interpretation of the CWA. **[Exhibit 3, p. 7, "the existing wetlands in the AJD review area *can be interpreted* as one large contiguous wetland that abuts much of the North Landing River . . . ." (emphasis added)].**

**<u>REQUEST FOR APPEAL</u>**

91. On November 11, 2024, Tri-City filed a Request for Appeal (RFA) of the unsolicited AJD.

92. On September 2, 2025, the Corps North Atlantic Division issued its Final Decision on the Request for Appeal. **[Exhibit 4].**

93. In its Final Decision, the Corps North Atlantic Division found that the Norfolk District's "one wetland concept" by which it claimed federal jurisdiction through Elbow Road is not supported by the record. **[Exhibit 4, p. 12-13]**

94. In its Final Decision, the Corps North Atlantic Division found that the Norfolk District's use of "remote resources" such as Soil Survey maps and the National Wetland Inventory (NWI) was insufficient to support the "one wetland concept" over Elbow Road. **[Exhibit 4, p. 12]**

95. In its Final Decision, the Corps North Atlantic Division warned the Norfolk District that relying on remote resources is, "not a substitute for a field determination using current guidance." **[Exhibit 4, p. 12]**

96. In its Final Decision, the Corps North Atlantic Division warned the Norfolk District that "past field work" performed in nearby areas – but not on the subject site – is insufficient to establish the presence of wetlands on the subject site. **[Exhibit 4, p. 12, "Beyond stating that the past fieldwork conducted by the District occurred to the north and south of Elbow Road, there is no information included in the AR that identifies the specific locations which the fieldwork occurred."]**

97. In its Final Decision the Corps North Atlantic Division determined, "the AR does not include sufficient documentation to demonstrate that a [continuous surface connection] is present between Wetland 1 and the A&C Canal or North Landing River, even with wetland areas larger than those mapped on the NWI." **[Exhibit 4, p. 13]**

98. Additionally, in its Final Decision the Corps North Atlantic Division found the Norfolk District's determination that the ditches (ie: the so-called "Tributaries 1 – 3") were "relatively permanent waterways" to be unsupported by the record. **[Exhibit 4, pp. 9 – 11]**

99. In its Final Decision, the Corps North Atlantic Division chastised the Norfolk District, warning that "Simply labeling a ditch as an RPW tributary without adequate documentation of that status is insufficient to establish jurisdiction." **[Exhibit 4, p. 10]**

100. In its Final Decision, the Corps North Atlantic Division explained to the Norfolk District that calling the ditches "relatively permanent waterways" must be supported by scientific data to provide context for the aerial images which included in the unsolicited AJD[4]. **[Exhibit 4, p. 11]**

101. In its Final Decision, the Corps North Atlantic Division explained to the Norfolk District that, "By not including this information in the AR, the District has not supported its determination that the on-site tributaries for which they determined Wetland-1 to be adjacent flow in a 'seasonal and predictable manner' and therefore meet the relatively permanent standard consistent with the pre-2015 regime." **[Exhibit 4, p. 11]**

102. In its Final Decision, the Corps North Atlantic Division found that Tri-City was disadvantaged by the Corps' decision to issue an unsolicited AJD. **[Exhibit 4, pp. 13-16].**

103. The Corps North Atlantic Division remanded the unsolicited AJD back to the Norfolk District for "further analysis and documentation in accordance with 33 CFR 331.10(b) for reconsideration due *to inadequate documentation and procedural compliance*, as outlined above in Reasons for Appeal 2 and 3. **[Exhibit 4, p. 16-17 (emphasis added)]**

**<u>THE REMANDED AJD</u>**

104. In late September 2026, officers from the Corps Norfolk District met with Tri-City to discuss the remanded AJD.

---

[4] The unsolicited AJD contained a single overhead photograph dated February 2, 2020, claiming, "Can see water present in Tributary 1." **[Exhibit 2, p. 22].** The North Atlantic Division found this to be unpersuasive and unsupported by any data.

105. On October 8, 2026, the Norfolk District finally issued its Memorandum for the Record ("MFR") regarding the remanded AJD which is the subject of this appeal. **[Exhibit 2].**

106. 33 CFR §331.8 states that, in no case, will the total appeal process extend beyond twelve months from date of receipt of an acceptable RFA.

107. Twenty-two months elapsed between the time that Tri-City filed its RFA and the Norfolk District issuing its remanded AJD. **[Exhibit 2]**

108. There were no extenuating circumstances which could justify the Norfolk District's delay in issuing its remanded AJD.

109. In preparing its remanded AJD, the Corps did not perform a site visit or conduct any kind of field testing.

110. Upon information and belief, no one from the Corps has been to the site since mid-2015. **[AR, p. 424, listing the most recent site visit for the 2015 AJD as May 14, 2015]**

111. The remanded AJD contains no new data or findings. It relies upon the same information and data sources as did the flawed unsolicited AJD. **[Exhibit 2, pp. 14 – 23 (remanded AJD); compare to Exhibit 3, pp. 13 – 27 (unsolicited AJD)].**

112. In fact, the remanded AJD contains even less support for its findings than the unsolicited AJD. **[Id.]**

113. The remanded AJD continues to rely upon the expired 2015 AJD. **[Exhibit 2, pp. 4 and 14]**

114. The remanded AJD continues to ignore the more accurate and more current 2023 wetlands delineation performed by the VDEQ. **[Exhibit 2, pp. 4 and 14]**

115. The remanded AJD continues to rely upon large scale USGS maps, accessed remotely via computer, which maps were created in the years 1907; 1918; 1948; 1955; 1965; and 1994. **[Exhibit 2, pp. 14 – 17]**.

116. The large scale USGSD maps are the same remote resources which the Corps North Atlantic Division found to be insufficient to establish federal jurisdiction. **[Exhibit 4, p. 12]**

117. The remanded AJD continues to rely upon National Wetlands Inventory (NWI) maps, accessed remotely by computer. **[Exhibit 2, p. 21-22].**

118. These are the same NWI maps that the Corps North Atlantic Division found to be insufficient to establish federal jurisdiction. **[Exhibit 4, p. 12]**

119. The remanded AJD continues to rely upon a remote, computer-accessed "Soil Survey." **[Exhibit 2, p. 24].**

120. This is the same Soil Survey that the Corps North Atlantic Division found to be insufficient to establish federal jurisdiction. **[Exhibit 4, p. 12]**

121. Instead of providing data from resources like the Antecedent Precipitation Tool to support aerial photographic evidence that the ditches are "relatively permanent waterways," the remanded AJD contains no such data. **[Exhibit 2]**

122. Whereas the unsolicited AJD included aerial photographs to purportedly show that "Tributaries 1 – 3" contain sufficient water to be considered "relatively permanent waterways" under Sackett, the remanded AJD contains no photographs of water in "Tributaries 1 – 3." **[Exhibit 2]**

123. Instead of providing additional evidence that the ditches are "relatively permanent waterways," the remanded AJD contains no evidence whatsoever. **[Exhibit 2]**

124. The unsolicited AJD admitted that the purported "continuous surface connection" between the ditches and North Landing River is broken by a highway known as Elbow Road. **[Exhibit 3, p. 7-8]**

125. The unsolicited AJD referred to Elbow Road at least nine (9) times. **[Exhibit 3, p. 7-8]**

126. The unsolicited AJD claimed jurisdiction across Elbow Road based on its "one wetland" theory, which the North Atlantic Division found to be unsupported by the record. **[Exhibit 4, p. 12-13]**

127. Instead of providing additional support for its claim that a "continuous surface connection" can exist through Elbow Road via its "one wetland" theory, the remanded AJD simply omits any reference to Elbow Road altogether. **[Exhibit 2].**

128. Whereas the unsolicited AJD admits that the Corps' finding of federal jurisdiction across Elbow Road via the "one wetland" concept is just one possible interpretation of the CWA, the remanded AJD removes the "interpretation" admission and simply makes the conclusory statement – without additional evidence – that, "The wetlands within the AJD review area are part of a larger contiguous wetland complex . . . ." **[Exhibit 2, p. 9; compare to Exhibit 3, p. 7**]

129. Whereas the unsolicited AJD admitted that the man-made, non-navigable Stumpy Lake is not subject to federal jurisdiction, the remanded AJD claims that Stumpy Lake is a jurisdictional waterbody without providing any explanation for the purported change in status. **[Exhibit 2, p. 12, under Jurisdictional Waters, sub-para (d)]**

130. Despite offering no new data in support of its positions, the remanded AJD continues to claim federal jurisdiction via a 3.45-mile long series of non-navigable, "man-altered," unnamed, offsite, ditches; through a dammed-up lake; and under (or perhaps over) a highway.

**THE AJD IS NOT BASED ON A VALID WETLANDS DELINEATION**

131. The remanded AJD is invalid because it is not based on a current wetlands delineation.

132. In its Final Decision, the Corps North Atlantic Division found the Norfolk District's determination of wetlands on the property to be unsupported by the record, and directed the Norfolk District to "provide a complete and detailed rationale supporting its conclusions, in accordance with the current regulatory regime." **[Exhibit 4, p. 7]**

133. Despite being provided with a current wetlands delineation performed on-site by the VDEQ, the Corps elected to disregard the current delineation in favor of an AJD issued in 2015. **[Exhibit 2, p. 3 – 4; and 14]**

134. The AJD upon which the Corps is relying was issued eight (8) years before the Supreme Court dramatically changed the limits of federal jurisdiction in Sackett.

135. An AJD is only valid for five years and is unenforceable after that time. This very Court recently affirmed that basic fact: "[A]n approved jurisdictional determination lasts for only five years. Precon cannot allege that the 2012 jurisdictional determination continues to impact the wetlands when it is no longer enforceable under the law." Precon Dev. Corp., Inc. v. United States Army Corps of Eng'rs, 2025 U.S. Dist. LEXIS 27443, *14 (E.D. Va., 2025).

136. The AJD upon which the Corps is relying upon expired in 2020.

137. The Code of Federal Regulations allows the Corps to issue a written reverification of an AJD when circumstances warrant it. 33 CFR 331.2.

138. No reverification has ever occurred, leaving the expired 2015, pre-Sackett AJD as the only basis under which the Corps claims the presence of federal wetlands.

139. Despite being provided a current wetlands delineation performed on-site by the VDEQ in 2023, the Corps elected to disregard the current delineation and instead rely upon large scale maps ranging from thirty-two (32) years old at the most recent, to one hundred and nineteen (119) years old. **[Exhibit 2, pp. 14 – 20]**

140. The remanded AJD continues to rely upon a National Wetlands Inventory (NWI) map, accessed remotely by computer, which the Corps' North Atlantic Division found to be insufficient to establish federal jurisdiction. **[Exhibit 2, p. 21-22]**

141. The remanded AJD continues to rely upon a remote, computer-accessed "Soil Survey," which the Corps' North Atlantic Division found to be insufficient to establish federal jurisdiction. **[Exhibit 2, p. 24]**

142. Despite being told by the North Atlantic Division that reliance on such resources is, "not a substitute for a field determination using current guidance," the Norfolk Division elected not to perform on-site testing and has not been onsite since at least 2015.

143. The North Atlantic Division determined that the unsolicited AJD was insufficient to establish the presence of federal wetlands. The remanded AJD is even more so. The AJD should be reversed on that basis alone.

**<u>THERE IS NO CONTINUOUS SURFACE CONNECTION ACROSS ELBOW ROAD</u>**

144. In order to establish federal jurisdiction, the government must establish that the "tributaries" that purportedly connect the site to the North Landing River provide a "continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." <u>Sackett</u> at 678-679.

145. Roads, including culverted roads, break the continuous surface connection required to establish federal jurisdiction. *See* Sackett at 663; *See also* Lewis v. United States, 88 F.4th 1073, 1076 (5th Cir. 2023).

146. The unsolicited AJD admitted multiple times that the purported "continuous surface connection" between the site and the North Landing River crosses under or over a highway known as Elbow Road. **[Exhibit 4, pp. 7-8]**

147. Instead of providing additional support for its claim that a "continuous surface connection" exists over or under Elbow Road via its "one wetland" theory, the remanded AJD omits any reference to the road. **[Exhibit 2]**

148. Despite the Corps' attempt to omit the Elbow Road issue in its written report, the imagery in the remanded AJD shows that alleged "flowpath" to the North Landing River is interrupted by Elbow Road.

**[see image next page]**




**[Exhibit 2, p. 10, with "call-out" added by Plaintiff's counsel]**

149. Elbow Road breaks the alleged "continuous surface connection" between the tributaries and the North Landing River.

**STUMPY LAKE IS NOT SUBJECT TO FEDERAL JURISDICTION**

150. Federal jurisdiction exists only over navigable water bodies. Sackett at 672 ("At a minimum, then, the use of "navigable" signals that the definition principally refers to bodies of navigable water like rivers, lakes, and oceans.")

151. The Corps Norfolk District maintains a publicly-available list of navigable waterways which are subject to the CWA, included as **Exhibit 5** and accessible at: https://www.nao.usace.army.mil/Portals/31/docs/regulatory/guidance/section_10_determinations.pdf

152. Stumpy Lake is not included on the Norfolk District's list of navigable waterbodies which are subject to CWA jurisdiction. **[Exhibit 5]**

153. This Court may take judicial notice that Stumpy Lake is not a navigable waterbody subject to CWA jurisdiction. **Fed. R. Evid 201**.

154. The unsolicited AJD admits that Stumpy Lake is not a jurisdictional waterbody. **[Exhibit 4, p. 11, under "Jurisdictional Waters, stating that the "impoundment" is non-jurisdictional]**

155. However, the remanded AJD claims that Stumpy Lake is a jurisdictional "impoundment" while providing no explanation for the purported change in status. **[Exhibit 2, p. 12, under Jurisdictional Waters, sub-para (d)]**

156. Stumpy Lake is a man-made lake created by a dam. **[Exhibit 2, pp. 9, 12]**

157. Stumpy Lake is not a "highway of interstate or foreign commerce."

158. There is no way for boats or other marine traffic to transit through Stumpy Lake.

159. As the North Atlantic Division reminded the Norfolk District in its Final Decision, waterways that flow "only in response to precipitation and intermittent streams which do not typically flow year-round or have continuous flow at least seasonally" are not under federal jurisdiction. **[Exhibit 4, p. 10]**

160. Stumpy lake is not a continuously flowing waterbody.

161. For most of the year, water does not flow across the dam. **[AR, p. 116]**

162. Stumpy Lake is not adjacent to any wetlands that may exist on the site.

163. Stumpy Lake is easily distinguishable from any wetlands which may be on the site.

164. Although the Corps claims that Stumpy Lake is connected to on-site wetlands, its own data shows that this is not true.




**[Exhibit 2, p.7 from the 2015 AJD upon which the Corps continues to rely]**

## <u>THE "TRIBUTARIES" ARE NOT RELATIVELY PERMANENT WATERWAYS</u>

165. In order to establish federal jurisdiction, the Corps must show that so-called "Tributaries 1 – 3" are "relatively permanent waterways" as that term is used in <u>Sackett</u>.

166. A "relatively permanent waterway" is one that can be "described in ordinary parlance as streams, oceans, rivers, and lakes." <u>Sackett</u> at 671.

167. Moreover, in <u>Sackett</u> the Supreme Court clarified that federal jurisdiction exists only over those bodies of water if they are navigable. <u>Sackett</u> at 672 ("At a minimum, then, the use of "navigable" signals that the definition principally refers to bodies of navigable water like rivers, lakes, and oceans.")

168. "Tributaruies 1 – 3" are not included on the Norfolk District's list of navigable waterways which are subject to CWA jurisdiction. **[Exhibit 5]**

169. This Court may take judicial notice that "Tributaruies 1 – 3" are not navigable waterways subject to CWA jurisdiction. **Fed. R. Evid 201**.

170. "Tributaries 1 – 3" are not streams, rivers, oceans, or lakes. They are ditches.

171. "Tributaries 1 – 3" are not highways of interstate or foreign commerce.

172. Waterways that flow "only in response to precipitation and intermittent streams which do not typically flow year-round or have continuous flow at least seasonally" are not under federal jurisdiction. **[Exhibit 3, p. 10]**

173. In its Final Decision, the Corps North Atlantic Division found the Norfolk District's determination that "Tributaries 1 – 3" were "relatively permanent waterways" to be unsupported by the record. **[Exhibit 4, pp. 9 – 11]**

174. The Corps North Atlantic Division chastised the Norfolk District for its sloppiness, saying "Simply labeling a ditch as an RPW tributary without adequate documentation of that status is insufficient to establish jurisdiction. **[Exhibit 4, p. 10]**

175. Unlike the unsolicited AJD, the remanded AJD contains no aerial photographs to support the Corps' claim that the ditches are "relatively permanent waterways." **[Exhibit 2]**

176. Instead of providing any additional evidence that the ditches are "relatively permanent waterways," the remanded AJD contains no evidence whatsoever. **[Exhibit 2]**

177. The North Atlantic Division determined that the unsolicited AJD was insufficient to establish that "Tributaries 1 – 3" are "relatively permanent waterways." The remanded AJD is even more so. The AJD should be reversed on that basis alone.

**THE REMANDED AJD DOES NOT RESOLVE THE ISSUES IN THE UNSOLICITED AJD**

178. In its Final Decision, the North Atlantic Division found that the Corps Norfolk District has failed to support its conclusion that the site is connected to WOTUS via a "continuous surface connection." **[Exhibit 4, p. 13]**

179. In particular, the North Atlantic Division found that the Corps Norfolk District "has not supported its determination that the on-site tributaries for which they determined Wetland-1 to be adjacent flow in a 'seasonal and predictable manner' and therefore meet the relatively permanent standard consistent with the pre-2015 regime." **[Exhibit 4, p. 11]**

180. The North Atlantic Division stated, "Simply labeling a ditch as an RPW tributary without adequate documentation of that status is insufficient to establish jurisdiction." **[Exhibit 4, p. 10]**

181. The remanded AJD still does not support its conclusion that "Tributaries 1 – 3" are relatively permanent waterways, but instead continues to call them RPWs without any evidence. **[Exhibit 2]**

182. In its Final Decision, the Corps North Atlantic Division found the Norfolk District's "one wetland" theory to be unsupported by the record, and directed the Norfolk District to "provide a complete and detailed rationale supporting its conclusions, in accordance with the current regulatory regime." **[Exhibit 4, p. 7]**

183. The Corps North Atlantic Division reminded the Norfolk District that relying on such resources is, "not a substitute for a field determination using current guidance." **[Exhibit 4, p. 12]**

184. The remanded AJD relies upon the same outdated maps and remote computer resources, while disregarding an on-site analysis performed by the VDEQ. **[Exhibit 2]**

185. The remanded AJD still does not support its determination that federal wetlands are present on site. **[Exhibit 2]**

186. The remanded AJD contains no new data or resources. **[Exhibit 2]**

187. The remanded AJD is even more inadequate than the unsolicited AJD, and must be reversed.

188. The Administrative Record clearly shows that the Corps' assertion of jurisdiction over the site is unsupported by the record; arbitrary; capricious; an abuse of discretion; exceeds the agency's authority; is unsupported by substantial evidence; and is unwarranted by the facts.

**BAD FAITH AND UNREASONABLE DELAY**

189. 5 U.S.C. §706(1) allows a plaintiff to bring suit against a government agency if the agency has unreasonably delayed issuing its final agency action. *See also* Grosscup v. Pantano, 725 F. Supp. 2d 1370, 1376 (S.D. Fla, 2010)(finding that a landowner sufficiently alleged unreasonable delay when the Corps failed to make decision on a revised permit application for just over a year).

190. 33 CFR §331.8 states that, in no case will the total appeal process extend beyond twelve months from date of receipt of an acceptable Request for Appeal (RFA).

191. Twenty-two months elapsed between the time that Tri-City filed its RFA and the Norfolk District issuing its MFR for the remanded AJD.

192. There were no extenuating circumstances which could justify the Norfolk District's delay in issuing its remanded AJD. This is an unreasonable delay far in excess of the maximum time limit set forth in 33 C.F.R. § 331.8.

193. The Corps' multiple errors in the remanded AJD are generally identical to the multiple errors in the original unsolicited AJD, for which the Corps North Atlantic Division

expressly castigated the Corps. Regardless, the Corps still intentionally repeats the errors to claim federal jurisdiction.

194. 5 U.S.C. §706(2) allows a plaintiff to bring suit against a government agency when the agency's actions are arbitrary; capricious; an abuse of discretion; exceeds the agency's authority; is unsupported by substantial evidence; or unwarranted by the facts.

195. The Corps' refusal to accept the Virginia Department of Environmental Quality (VDEQ) assessment, opting instead to rely upon a long-expired pre-Sackett AJD unsupported by field work shows that the Norfolk District did not intend to issue an unbiased AJD, but intends to claim federal jurisdiction over the property regardless of the circumstances. This is bad faith.

196. In several instances, information that was present in the unsolicited AJD was changed or omitted without any evidence or explanation, apparently because changing or omitting the information better supported the Corps' claim of federal jurisdiction. This is bad faith.

197. For example, the unsolicited AJD admits that the Corps' finding of federal jurisdiction is just one possible interpretation of the CWA. **[Exhibit 4, p. 7, "the existing wetlands in the AJD review area *can be interpreted* as one large contiguous wetland that abuts much of the North Landing River . . . ." (emphasis added]**

198. By contrast, the remanded AJD removes the "interpretation" admission and simply makes the conclusory statement – without additional evidence – that, "The wetlands within the AJD review area are part of a larger contiguous wetland complex . . . ." **[Exhibit 2, p. 9].**

199. As another example, the unsolicited AJD admitted that the purported "continuous surface connection" between the ditches and North Landing River is broken by a highway known as Elbow Road, referring to Elbow Road at least nine times. **[Exhibit 4, p. 7-8]**

200. By contrast, the remanded AJD omits any reference to Elbow Road, with no explanation for the omission. **[Exhibit 2].**

201. As yet another example, the unsolicited AJD admits that Stumpy Lake is not a jurisdictional waterbody. **[Exhibit 4, p. 11]**

202. By contrast, the remanded AJD claims that Stumpy Lake is a jurisdictional waterbody while providing no explanation for the purported change in status. **[Exhibit 2, p. 12**].

203. For the reasons explained in the foregoing and otherwise contained in the administrative record, the Corps' finding of federal jurisdiction over this site is knowingly and arbitrarily capricious. It is plainly wrong and must be reversed.

**FIRST CLAIM FOR RELIEF -- INJUNCTIVE RELIEF**

204. Plaintiff hereby realleges and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

205. Plaintiff wishes to conduct its business activities on the site free of the Corps' wrongful claims of federal jurisdiction under the CWA; and/or the Corps' unreasonable and intentional delay in correcting its flawed AJD as per the Supreme Court's mandatory guidance in Sackett.

206. Plaintiff is and will continue to be directly affected and injured by the Corps' expansive and unlawful assertion of CWA jurisdiction over the site.

207. The Corps' remanded AJD imposes significant injury on Plaintiff by preventing it from using its private property as it wishes without risking a government enforcement proceeding, fines, and penalties.

208. As a direct result of the Corps' unlawful actions, Plaintiff's use of the site has been, and is being, adversely affected.

209. Unless the Court grants relief, Plaintiff's use and enjoyment of the site will continue to be adversely affected. Hence, the Corps' unlawful exercise of jurisdiction causes Plaintiff irreparable injury.

210. Setting aside the Corps' AJD will redress Plaintiff's injuries by allowing Plaintiff to use the site as it had planned prior to the Corps' unlawful exercise of power.

211. The Corps' remanded AJD is a final agency action subject to judicial review under the APA. United States Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590 (2016); *see also* 333 C.F.R. §331.2.

212. Plaintiff has exhausted all administrative procedures and remedies as required under the APA.

213. Accordingly, injunctive relief enjoining the Corps from exercising jurisdiction under the CWA is appropriate.

**SECOND CLAIM FOR RELIEF -- DECLARATORY JUDGMENT**

214. Plaintiff hereby realleges and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

215. Plaintiff has no plain, speedy, and adequate remedy at law.

216. An actual and substantial controversy exists between Plaintiff and the Corps over the Corps' failure to comply with the CWA in determining that Plaintiff's property contains a jurisdictional waterbody; and/or the Corps' failure to correct its AJD as per the Supreme Court's clear mandatory guidance in Sackett.

217. Plaintiff contends that its property contains no waterbodies/wetlands under federal jurisdiction, whereas the Corps, through its remanded AJD, contends that it does.

218. The Corps has had years to develop information supporting its allegations of jurisdiction; there is a complete administrative record on which the remanded AJD was made; and any further administrative proceedings before the Corps would be futile. Therefore, no further factual development is necessary to resolve the legal issues raised by this action.

219. The Corps' remanded AJD is a final agency action subject to judicial review under the APA. United States Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590 (2016); *see also* 333 C.F.R. §331.2.

220. The case is currently justiciable because the Corps has unlawfully asserted jurisdiction over Plaintiff's property.

221. Plaintiff is currently and continuously injured by the Corps' unlawful exercise of jurisdiction because the existence of the AJD substantially decreases the value of the property and prevents Plaintiff from developing the property without fear of an enforcement action being brought against it.

222. Plaintiff is currently and continuously injured by the AJD because it is obligated to go through the time-consuming and expensive process of obtaining a Section 404 permit from the Corps before conducting their proposed activities, even assuming that the Corps would issue a permit at all.

223. Plaintiff is entitled to a declaratory judgment declaring that the AJD is invalid and that the Corps does not have jurisdiction over the Property pursuant to the CWA.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment as follows:

1. A declaration that Plaintiff's property is not subject to the CWA;

2. A declaration that Defendant's Approved Jurisdictional Determination is invalid;

3. An injunction enjoining Defendant from exercising jurisdiction over Plaintiff's property;

4. An award of attorney's fees as per 28 U.S.C. §2412(d)(1)(A), together with expenses, and costs; and,

5. For any such other and further relief that the Court deems proper under the circumstances of this case.

DATED: November 16, 2026.

Respectfully submitted,

**TRI-CITY PROPERTIES, LLC**

By: /s/ Bryan S. Peeples______
Bryan S. Peeples (VSB# 93709)
PENDER & COWARD, P.C.
222 Central Park Avenue, Suite 400
Virginia beach, VA 23462
Phone/Fax: 757.490.6283
bpeeples@pendercoward.com
*Counsel for the Plaintiff*